SALINA M. KANAI #8096
Federal Public Defender
District of Hawaii

MAX J. MIZONO #10245
Assistant Federal Defender
300 Ala Moana Boulevard, Suite 7104
Honolulu, Hawaii  96850-5269
Telephone:  (808) 541-2521
Facsimile:  (808) 541-3545
E-Mail:     max_mizono@fd.org

Attorney for Defendant
WALTER GLENN PRIMROSE

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 22-00060-LEK |
| | ) | |
| Plaintiff, | ) | MOTION FOR REVOCATION OF |
| | ) | DETENTION ORDER AND |
| vs. | ) | APPEAL OF DETENTION ORDER; |
| | ) | EXHIBITS "A - B"; CERTIFICATE |
| WALTER GLENN PRIMROSE, | ) | OF SERVICE |
| | ) | |
| Defendant. | ) | |
| | ) | |

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ..................................................... i

TABLE OF AUTHORITIES ............................................... ii

I.      SUMMARY OF DEFENDANT'S POSITION ....................................... 2

II.     BACKGROUND AND PROCEDURAL HISTORY ............................ 2

III.    APPLICABLE LAW ............................................... 3

IV.    ARGUMENT ..................................................... 5

      A.    The Government Cannot Prove by a Preponderance
of the Evidence that Mr. Primrose is a Serious Flight Risk .......... 6

      B.    Even if the Court Determines Mr. Primrose is a Serious
Flight Risk, There are Conditions That Will Reasonably
Assure His Appearance and the Safety of the Community ......... 17

           1.   *The Nature and Circumstances of the Offense* ....................... 18

           2.   *Weight of the Evidence* ......................................... 21

           3.   *Mr. Primrose's History and Characteristics* ........................ 22

           4.   *The Nature and Seriousness of the Danger Posed
by Release* ............................................... 23

      C.    Defendants on Bond Are Not Likely to Flee or Recidivate ......... 24

IV.    CONCLUSION ..................................................... 25

EXHIBIT "A"

EXHIBIT "B"

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Herzog v. United States*, 75 S.Ct. 349, 99 L.Ed. 1299 (1955) ............................ 4

*Sellers v. United States*, 89 S.Ct. 36, 21 L.Ed.2d 64 (1968) ............................... 4

*United States v. Abad*, 350 F.3d 793 (8th Cir. 2003) ........................................ 17

*United States v. Friedman,* 837 F.2d 48 (2d Cir.1988) ........................................ 5

*United States v. Jones*, 566 F. Supp. 2d 288 (S.D.N.Y. 2008) ......................... 21

*United States v. Koenig,* 912 F.2d 1190 (9th Cir. 1990) .................................... 5

*United States v. Madoff,* 586 F.Supp.2d 240 (S.D.N.Y. 2009) .......................... 5

*United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985) ......................... 3, 21

*United States v. Orta*, 760 F.2d 887 (8th Cir. 1985) .......................................... 4

*United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095 (1987) ........................ 3

*United States v. Townsend*, 897 F.2d 989 (9th Cir. 1990) ............................ 3, 21


**Statutes**

18 U.S.C. § 371   ............................................................................................... 2

18 U.S.C. § 1028   ............................................................................................. 2

18 U.S.C. § 1542   ............................................................................................. 2

18 U.S.C. § 3141   ............................................................................................. 3

18 U.S.C. § 3142   ................................................................................ 4, *passim*

18 U.S.C. § 3145   ............................................................................................. 1

## **Publications**

Jennifer Henderson and Amanda Musa, *Hawaii couple charged with assuming the identities of dead children*, CNN (August 2, 2022), https://cnn.it/3QvHP2O (last visited August 10, 2022) .................................... 14

Lynn Kawano, *They lived quiet lives in Hawaii for years. The US alleges they were actually Russian spies*, Hawaii News Now (July 26, 2022), https://bit.ly/3djNAlV (last visited August 10, 2022) ............ 14

Kevin Knodell, *Feds arrest Kapolei couple, allude to Russian intelligence ties*, Honolulu Star Advertiser (July 28, 2022), https://bit.ly/3BVzTE0 (last visited August 10, 2022) ........................................................................ 14

James C. Oleson, et al., *The Sentencing Consequences of Federal Pretrial Supervision,* 63 Crime and Delinquency 313, 325 (2017), archived at https://perma.cc/QAW9-PYYV ..................................................... 24

David Proper, *Hawaii couple with possible KGB ties charged with stealing IDs of dead babies*, New York Post (July 27, 2022), https://bit.ly/3SFDAUm (last visited August 10, 2022) .................................. 14

U.S. District Courts, *Pretrial Services Violations Summary Report for the 12-Month Period Ending December 31, 2019,* AO Table H-15, archived at https://perma.cc/LYG4-AX4H ................................................. 24, 25

## **Other**

Bail Reform Act of 1984 ........................................................................ 3, 13, 24

Criminal Local Rules of Practice for the United States District Court for the District of Hawaii Rule 57.7 ...................................... 1, 5

SALINA M. KANAI #8096
Federal Public Defender
District of Hawaii

MAX J. MIZONO #10245
Assistant Federal Defender
300 Ala Moana Boulevard, Suite 7104
Honolulu, Hawaii  96850-5269
Telephone:  (808) 541-2521
Facsimile:  (808) 541-3545
E-Mail:       max_mizono@fd.org

Attorney for Defendant
WALTER GLENN PRIMROSE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 22-00060-LEK |
| | ) | |
| Plaintiff, | ) | MOTION FOR REVOCATION OF |
| | ) | DETENTION ORDER AND |
| vs. | ) | APPEAL OF DETENTION ORDER; |
| | ) | EXHIBITS "A - B"; CERTIFICATE |
| WALTER GLENN PRIMROSE, | ) | OF SERVICE |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MOTION FOR REVOCATION OF DETENTION ORDER
AND APPEAL OF DETENTION ORDER**

Pursuant to 18 U.S.C. § 3145(b) and Criminal Local Rules of Practice for

the United States District Court for the District of Hawaii Rule 57.7, Defendant

WALTER GLENN PRIMROSE moves the District Court to revoke the Honorable

U.S. Magistrate Judge Rom Trader's Order of Detention Pending Trial, filed

July 29, 2022, and to release him with restrictive conditions, including home

detention, GPS electronic location monitoring, and the posting of a bond secured

by cash deposited with the Court.

## I.      SUMMARY OF DEFENDANT'S POSITION

A balancing of societal interests with Mr. Primrose's liberty interests can be

accomplished with release under restrictive conditions, including a condition

requiring him to abide by home detention and GPS electronic location monitoring,

as well as any other restrictive conditions which will suffice to eliminate any

serious risk that he will flee. Mr. Primrose's personal history and characteristics,

his lack of any criminal record, and his willingness to abide by any conditions of

release, including the posting of a bond secured by cash deposited with the Court,

demonstrate that he can be safely released into the community and will attend

future court proceedings as required.

## II.     BACKGROUND AND PROCEDURAL HISTORY

On July 21, 2022, the government filed a three-count Criminal Complaint

against Mr. Primrose and his co-defendant, charging Mr. Primrose specifically

with: (1) Conspiracy to Commit Offense Against the United States, in violation of

18 U.S.C. § 371; (2) Aggravated Identity Theft, in violation of 18 U.S.C.

§ 1028A(1); and (3) False Statement in Application and Use of Passport, in

violation of 18 U.S.C. § 1542. *See* ECF No. 1. On July 25, 2022, the same day of

2

his initial appearance, ECF No. 11, the government filed a Motion to Detain

("Motion"). *See* ECF No. 10. The government also filed an exhibit in support of its

Motion. *See* ECF No. 12. On July 28, 2022, the Court held a detention hearing.

ECF No. 21. On the same day, the government filed an Indictment against Mr.

Primrose and his co-defendant, alleging the same charges as the Complaint. *See*

ECF No. 19. On July 29, 2022, the Court issued its Order of Detention Pending

Trial ("Detention Order") and determined that, by a preponderance of the evidence,

there was no condition or combination of conditions that will reasonably assure

Mr. Primrose's appearance as required. *See* ECF No. 24. On August 2, 2022, the

Court held an Arraignment and Plea to the Indictment, and Mr. Primrose entered

not guilty pleas. ECF No. 28. Trial is currently set for September 26, 2022. *Id.*

### III.    APPLICABLE LAW

The release or detention of a defendant pending trial is governed by the Bail

Reform Act of 1984 ("Act"). *See* U.S.C. §§ 3141 *et seq*. In *United States v.*

*Salerno*, 481 U.S. 739, 107 S.Ct. 2095 (1987), the Supreme Court upheld the

constitutionality of the Act, while noting that "[i]n our society, liberty is the norm,

and detention prior to trial or without trial is the carefully limited exception." *Id.* at

755. As stated in *United States v. Townsend*, 897 F.2d 989, 993-94 (9th Cir. 1990),

federal law has traditionally provided that a person arrested for a non-capital

offense *shall be admitted to bail*. *Id.* (emphasis added) (citing *United States v.*

3

*Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985)). A court should deny release only

in rare cases. *Id.* (citing *Sellers v. United States*, 89 S.Ct. 36, 38, 21 L.Ed.2d 64

(1968)). Doubts regarding the propriety of release are to be resolved in favor of

defendants. *Id.* (citing *Herzog v. United States*, 75 S.Ct. 349, 351, 99 L.Ed. 1299

(1955)).

The Act establishes a "statutory progression" regarding the release of

defendants prior to trial. *See United States v. Orta*, 760 F.2d 887, 891 (8th Cir.

1985). Section 3142(a) provides four alternatives from which the judicial officer

must choose. The defendant may be: (1) released on personal recognizance or on

an unsecured appearance bond; (2) released on conditions; (3) temporarily detained

for other purposes; or (4) detained under section 3142(e).

Section 3142(b) provides the court must order the pretrial release of the

person on personal recognizance, or upon execution of an unsecured appearance

bond, "unless the judicial officer determines that such release will not reasonably

assure the appearance of the person as required or will endanger the safety of any

other person or the community." Upon such a showing, the court should ordinarily

order release on conditions, as described in section 3142(c). Only where the

judicial officer finds that no condition or combination of conditions will reasonably

assure the appearance of the person as required and the safety of any other person

and the community, may the court order the defendant detained prior to trial,
pursuant to section 3142(e).

Before ordering detention, moreover, the court must hold a detention
hearing, which is only authorized under those circumstances enumerated in section
3142(f). Thus, if the Government moves to have a defendant detained prior to trial,
the Court must undertake a two-step analysis. *United States v. Friedman,* 837 F.2d
48, 49 (2d Cir.1988); *United States v. Madoff,* 586 F.Supp.2d 240, 247 (S.D.N.Y.
2009). The Court must first determine whether pretrial detention is authorized
under section 3142(f). If pretrial detention is authorized, then the Court must
determine, pursuant to section 3142(e), whether there is any condition or
combination of conditions which will reasonably assure the defendant's appearance
as required and the safety of any other person and the community if he is released.

On appeal, this Court conducts a *de novo* review of the Magistrate Judge's
findings.[1] *See, e.g.,* Criminal Local Rule 57.7; *United States v. Koenig,* 912 F.2d
1190, 1191 (9th Cir. 1990).

## IV.   ARGUMENT

In this case, the government cannot prove by a preponderance of the
evidence that Mr. Primrose is a serious flight risk. And even if this Court

---

[1]      The Magistrate Judge determined that, by a preponderance of the evidence,
there was no condition or combination of conditions that will reasonably assure
Mr. Primrose's appearance as required.

5

determines that the government can meet its burden, there are nevertheless conditions that will reasonably assure Mr. Primrose's appearance at Court. Accordingly, this Court should release Mr. Primrose on conditions including, *inter alia*, home detention, GPS electronic location monitoring, and the requirement that Mr. Primrose post a bond secured by cash deposited with this Court.

### A.    The Government Cannot Prove by a Preponderance of the Evidence that Mr. Primrose is a Serious Flight Risk

The government's Motion, ECF No. 10, as well its arguments at the hearing on its Motion, *see* Exhibit A (Transcript of Detention Hearing), do not prove by a preponderance of the evidence that Mr. Primrose presents a serious risk of flight. *See* 18 U.S.C. § 3142(f)(2). Begin with its Motion. The government, apparently, first argues that Mr. Primrose presents as a serious flight risk because he "held a secret clearance" while working for both the U.S. Coast Guard and then a defense contractor. *Motion*, at p. 2. Having a "secret clearance," however, does not establish—by a preponderance of the evidence or, frankly, any standard of evidentiary proof—that someone is a serious flight risk. It instead demonstrates that the U.S. Coast Guard and his subsequent employer entrusted Mr. Primrose (or, as the government alleges, Mr. Bobby Edward Fort), with such clearance because he was a valued, important, and high-ranking employee.

Moreover, and revealingly, the government does not allege that Mr. Primrose somehow abused or misused this "secret clearance" in any way. The

6

government does not allege that Mr. Primrose "stole" any classified information. The government does not allege that he accessed or handled material that he was prohibited from doing so. The government does not allege that any classified information or materials went unaccounted for during his employment, or ended up in the possession of a foreign adversary.

In reality, and irrespective of whatever name or identity the government alleges Mr. Primrose used to join the U.S. Coast Guard, Mr. Primrose was never, not once, reprimanded, punished, or discharged by the U.S. Coast Guard (or his subsequent employer) for any improprieties during his years of employment either related to his secret clearance or anything else. Thus, for the government to rely solely upon conjecture and speculation regarding Mr. Primrose's access to and handling of such classified information is not an argument this Court should view as a credible basis to detain him. *See* Exhibit A, at p. 13 ("It's unclear what kind of information, if any, he may have stolen or provided to others in connections with his work with the military and as a civilian with the Department of Defense.").

The government's Motion then argues that while Mr. Primrose was employed with the U.S. Coast Guard, he allegedly "did not report several trips to Canada." *Motion*, at p. 2. It is unclear from the government's Motion whether Mr. Primrose's purported foreign travel to Canada was for work purposes with the U.S. Coast Guard, or for something else. At the detention hearing, the government

likewise failed to provide any additional context in this regard. *See* Exhibit A, at p. 10 ("Law enforcement has also determined to date the Defendant omitted some, but not all of his foreign travel when he was complying with mandatory recording requirements triggered by his security clearance."). It is nevertheless believed that the government is referring to Mr. Primrose's alleged failure to report work-related travel. If so, then there is a full accounting of Mr. Primrose's travel record contained in the U.S. Coast Guard's "Air Crew Log Book," and any alleged failure by Mr. Primrose to report such travel is inconsequential. And if it is true that Mr. Primrose failed to report this travel, he would submit it was merely an oversight on his part, and that it was not done for nefarious purposes. He would even acknowledge to this Court that the travel occurred. Simply put, he has nothing to hide.

That Mr. Primrose allegedly failed to report certain foreign travel to Canada, furthermore, does not somehow demonstrate his serious risk of flight. The government does not appear to allege that Mr. Primrose somehow snuck into Canada or back into the United States, or that he did not comply with any exit or entry requirements. And, as described more fully *infra*, a condition of his release can require him to self-surrender all passports in his possession—if they have not already been seized by the government—which would mitigate against any potential serious flight risk to a foreign country. Mr. Primrose could also be

8

required to surrender all forms of identification and be subjected to a travel restriction to the island of Oahu, along with home detention and GPS electronic location monitoring, to guard against and, frankly, prevent, inter-island or U.S. mainland travel. Such restrictions—along with the geographical location of Oahu—would render it all but impossible for Mr. Primrose to escape to another jurisdiction.

The government's Motion next avers "[d]efendant Primrose through his work in the Coast Guard as an avionics technician has become highly skilled in electronics and would be able to communicate surreptitiously with others if released from pretrial confinement." *Motion*, at p. 2. To begin, it is presumed that the government has already seized all of Mr. Primrose's electronic devices. This Court, furthermore, could set additional stringent conditions of release—discussed *infra*—that would severely restrict—or even outlaw—the types of electronic devices Mr. Primrose would be able to own, possess, and/or use. Thus, when the ability to communicate with others—surreptitiously or not—has been stripped away in practical terms, the government cannot credibly argue that Mr. Primrose's prior skills as an avionics technician factors into or somehow evinces his serious risk of flight.

It is additionally unclear, moreover, *who* Mr. Primrose would communicate with to assist with any possible escape from the District of Hawaii. At his detention

9

hearing, the government did not proffer any evidence about the individual(s), or group(s), or foreign government(s), as to whom Mr. Primrose might communicate with to effectuate his departure. Rather, the government argued "[Mr. Primrose] might be motivated to share that information as part of a bid to flee the United States," *see* Exhibit A, at p. 13, yet another fallacious argument predicated only on guesswork. Indeed, the government has proffered *zero* evidence that Mr. Primrose has ever communicated with any foreign adversary, such as Russia, about anything related to his prior employment, or anything else, and there is no reason to believe he would do so now.

The following proffered information, however, is not guesswork. Mr. Primrose is a United States citizen. He has been a United States citizen his entire life. He has no allegiance to a foreign country, a foreign government, or foreign security agency. He has lived on Oahu since approximately June 2000, and even purchased two homes in Kapolei with money earned from his employment. He has no prior criminal record. He worked in the U.S. Coast Guard for over twenty years, and then for a subsequent employer until his arrest in this case, and his personnel files are devoid of disciplinary issues, reprimands, or any other concerns. And given that he owns *two* homes, this Court can release him to the one he resided in on restrictive conditions, including home confinement and GPS electronic location

10

monitoring, to mitigate against any serious flight risk, along with the other conditions previously discussed and to be discussed, *infra.*

In further support of detention, the government's Motion states, "it is believed that the defendants may have established aliases other than 'Bobby Edward Fort' … federal agents have seized letters at defendants' residence addressed to the defendants in their false identities in which the greetings in the letters refer to defendants by names other than Bobby [or] Walter." *Motion*, at p. 2. At the detention hearing, the government reiterated that "during the search[,] law enforcement located numerous other documents consistent with other fake aliases beyond Mr. Fort that were used potentially by the Defendant." *See* Exhibit A, at p. 12. The government's "belief" about these purported aliases, however, does not amount to proof by a preponderance of the evidence. If the government has credible evidence that these aliases were used to endanger the national security of the United States, or were used in *any* criminal manner, it should state so and present such letters as exhibits to this Court.[2] Anything short of that leaves it up to the defense and the Court's imagination and is a ploy that falls well short of the government's requisite burden of proof required to detain Mr. Primrose. The defense, rather, believes that these supposed letters are whimsical in nature, are not

---

[2]     As of this writing, discovery has not yet been produced to the defense.

criminal in any way whatsoever, and the mere fact that different names or aliases may or may not have used in them does not establish that Mr. Primrose is a serious flight risk by a preponderance of the evidence.

Last, in support of detention, the government's Motion references the photographs it seized from Mr. Primrose's residence that depict "the defendants apparently some years ago wearing what have been identified as KGB uniforms." *Motion*, at p. 3. The government also submitted the photographs in support of its Motion. *See* ECF No. 12. At Mr. Primrose's detention hearing, the government doubled down on the inflammatory nature of the photographs and again referenced law enforcement's discovery of the "polaroid photographs … of the Defendant and his wife both wearing what seems to be Russian KGB uniforms," *see* Exhibit A, at p. 9, to support detention.

Without outright stating so, the government's arguments, in tandem with its submission of the photographs, have had the intended effect of portraying Mr. Primrose and his co-defendant as Russian spies. The government, however, has never alleged that Mr. Primrose is a current KGB agent. It has not stated he is a former KGB agent. It does not allege he is a sleeper agent or a Russian spy. It has never said that he has ties to Russia. It has never stated he has communicated with Russians. It does not even claim he has *even* travelled to Russia, let alone any other

12

countries previously part of the "communist bloc" of the former U.S.S.R.[3] Indeed, if any of this was even *remotely* true, there is no doubt that the government would have presented these circumstances to the Court during the detention proceedings, and argued that they demonstrated Mr. Primrose's danger to the community by clear and convincing evidence under the Bail Reform Act. It did not. Even more tellingly, the government has *not* informed undersigned counsel about any pre-requisites to Mr. Primrose's representation.[4]

---

[3]   The government's Motion also states that Mr. Primrose's co-defendant, Gwynn Darle Morrison, aka "Julie Lyn Montague," possibly lived abroad in Romania some time ago "while that country was within the Communist bloc." *Motion*, at p. 2-3. This argument, however, does not aver that Mr. Primrose lived abroad—either with co-defendant Morrison or by himself—in Romania or anywhere else. The argument also fails to provide context about co-defendant Morrison's purported reasons for living abroad, which very well could have been for innocent purposes. Absent further context, this Court should not ascribe any improper meaning to his co-defendant's purported prior living arrangements, as the government's Motion, in tandem with its oral arguments, insinuates.

[4]   It is undersigned counsel's experience in prior cases involving national security matters that only certain defense counsel with requisite security clearances can engage in such representation. The reason for this is because such security clearance is required to review government evidence and materials in a secured location. Undersigned counsel *does not* have the requisite security clearance required for such cases. Thus, the lack of notice from the government likely means that top-secret security clearance is not required for Mr. Primrose's representation—as of now—and further demonstrates the unlikelihood that this case involves matters involving national security or defendants who are secret KGB agents and/or Russian spies.

13

This photograph, furthermore, absent *any* explanation or context from the government, only ratchets up the rampant speculation about what this case *could* be about. If the government has any credible evidence that Mr. Primrose and his co-defendant are Russian spies, or the like, it should unequivocally present such information to the Court instead of allowing the media and press to carry its water.[5]

Instead, the one *true* thing the defense has learned from the government about this photograph comes from a recent communication between the parties. In an email dated August 5, 2022, the government explained to the defense: "please be advised that a witness has said that the photos of Defendants Primrose and Morrison in a KGB uniform were taken sometime in the 1990's. Federal agents were given the alleged uniform." *See* Exhibit B. This email is informative for several reasons.

First, it seemingly confirms that Mr. Primrose and his co-defendant are wearing the same single uniform in the photographs, which would tend to suggest

---

[5]      *See* Lynn Kawano, *They lived quiet lives in Hawaii for years. The US alleges they were actually Russian spies*, Hawaii News Now (July 26, 2022), https://bit.ly/3djNAlV (last visited August 10, 2022); *see also* David Proper, *Hawaii couple with possible KGB ties charged with stealing IDs of dead babies*, New York Post (July 27, 2022), https://bit.ly/3SFDAUm (last visited August 10, 2022); *see* Kevin Knodell, *Feds arrest Kapolei couple, allude to Russian intelligence ties*, Honolulu Star Advertiser (July 28, 2022), https://bit.ly/3BVzTE0 (last visited August 10, 2022); *see also* Jennifer Henderson and Amanda Musa, *Hawaii couple charged with assuming the identities of dead children*, CNN (August 2, 2022), https://cnn.it/3QvHP2O (last visited August 10, 2022).

that they are not *both* spies. Second, and perhaps more importantly, the government alludes to the fact that *someone else* owned/possessed the KGB uniform and turned it into federal agents. Mr. Primrose's lack of ownership and possession of the alleged KGB uniform even more strongly supports the inference that he and his co-defendant, are not, in fact, Russian spies, and that the photographs of them are more akin to dressing up in a costume, engaging in cosplay, or the like.

Aside from its submission of the photographs and arguments about it at the detention hearing, the government also made reference to the discovery of other items at Mr. Primrose's residence to further cast him as a spy: "[i]n addition to the polaroid photographs, law enforcement located an invisible ink kit, documents that seemingly contained coded language, maps showing military bases, correspondence between the Defendants referencing an associate … who believed that the Defendant may have joined the CIA or became a terrorist in Bolivia[.]" *See* Exhibit A, at p. 9. Much like the photograph of Mr. Primrose wearing an alleged KGB uniform, it is believed that *all* these items have innocent, non-criminal explanations.

The "invisible ink kit" for example, is believed to be a toy purchased many years ago for entertainment. The government has never alleged that Mr. Primrose used this invisible ink kit set in any illicit manner. The documents containing

15

coded language, moreover, are likely the personal and whimsical letters discussed *supra*. And the map with military bases is likely a map Mr. Primrose obtained during his employment with the U.S. Coast Guard to learn of suitable bases to stay as a guest while travelling around the world, a supposed perk of his employment with the U.S. Coast Guard. In other words, these items, when properly examined and understood beyond surface level, are innocuous.

As for the letter referenced by the government in which Mr. Primrose is alleged to be a CIA agent, or a Bolivian terrorist, such information contained in it cannot credibly be reconciled with the underlying government allegation that he is a covert Russian operative. Stated otherwise, it is simply not feasible that Mr. Primrose is a member of the CIA, a Bolivian terrorist, *and* a Russian spy, all the while working at both the U.S. Coast Guard and a private employer and living a relatively low-key lifestyle in Kapolei for the last twenty years. The reference to this letter, as well as the other items, thus only adds fuel to the incessant innuendo and speculation underpinning the charges in this case.

In sum, the government should put its money where its mouth is, submit all this evidence to the Court, and let the Court ascertain the veracity behind its claims that Mr. Primrose is a Russian spy. From there, the Court can better determine that the government's arguments are without merit, and utterly fail to prove by a preponderance of the evidence that Mr. Primrose is a serious flight risk.

16

**B.     Even if the Court Determines Mr. Primrose is a Serious Flight Risk, There are Conditions That Will Reasonably Assure His Appearance and the Safety of the Community**

Even if the Court determines that pretrial detention is authorized, it is only appropriate if the Court "finds no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In other words, establishing that Mr. Primrose is a serious risk of flight is a prerequisite to his detention, but it is not sufficient. The government must also prove by a preponderance of the evidence that no condition or set of conditions will reasonably assure his appearance. *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003). It cannot.

Instead, there are multiple conditions which can be imposed to mitigate against serious flight risk. These conditions include but are not limited to: (1) the posting of a bond secured by cash deposited with the Court; (2) the surrender of any and all U.S. passports; (3) the surrender of any and all forms of identification; (4) restrictions on applying for any new forms of identification; (5) restrictions on use/possession of electronic devices, including but not limited to computers, tablets, and cellular phones; (6) travel restrictions to the island of Oahu; (7) home detention and curfew; and (8) GPS electronic location monitoring. These

17

conditions all align with those contemplated under 18 U.S.C. § 3142(c)(1)(B), and will assure that Mr. Primrose attends court as required. Mr. Primrose would also be amenable to any other conditions or restrictions the Court might order to secure his release.

Further, in determining whether there are conditions which will reasonably assure Mr. Primrose's appearance as required, the Court must consider the factors set forth in section 3142(g), including: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including – (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense, the person was on probation or parole; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. A consideration of these factors further demonstrates the appropriateness of Mr. Primrose's release on conditions.

1.    *The Nature and Circumstances of the Offense*

The first section 3142(g) factor concerns the nature and circumstances of the offense. At the detention hearing, the government argued that the statutory

maximum sentence for all counts, as well as its calculation of the advisory

sentencing guidelines in this case, counseled in favor of detention. *See* Exhibit A,

at p. 7. The offenses charged here, however, are relatively more benign in

comparison to many other offenses adjudicated by this Court regularly. While it is

nevertheless true that all federal criminal offenses are to be taken seriously, there is

no doubt that the charges against Mr. Primrose carry penalties far less onerous than

most others in federal court. For example, the five-year statutory maximum and

ten-year statutory maximum as to Counts One and Three, respectively, pale in

comparison to certain drug distribution offenses which carry statutory maximum

penalties of *life*. They also are significantly less than the twenty-year statutory

maximum for bank robbery, or the sexual exploitation of minors, which, upon first

offense, carries a statutory maximum penalty of thirty years, amongst many others.

The government also failed to mention, moreover, that this is *not* a case where the

charges filed against Mr. Primrose carry the presumption of detention that he must

rebut. He has nothing to rebut.

The two-year mandatory minimum as to Count Two, furthermore, is

significantly lower than five- and ten-year mandatory minimum—sometimes even

fifteen and twenty-five year—terms of imprisonment for certain illicit drug

distribution offenses and the distribution and production of child pornography, for

example. The charges and their expected advisory sentencing ranges are also

dwarfed by the sentencing ranges for most if not all controlled substances offenses, firearm offenses, other white-collar crimes such as mail and wire fraud, violent crimes, and sex offenses. So, while it is true that Mr. Primrose faces a term of imprisonment if convicted of all the charges, the government's grandstanding at the detention hearing—which it knew would be well-attended by local and national media and press—should not persuade this Court that the penalties associated with the nature and circumstances of the offense somehow counsel in favor of detention. They do not.

Even the Magistrate Judge essentially recognized that, but for the undertones of this case—not the actual offenses themselves—Mr. Primrose would be released, and it would not be a close call. *See* Exhibit A, at p. 15 ("[T]he nature of the offenses, in and of themselves, but for the context we find them, in this particular case, might otherwise lend itself to an assessment that release under very minimal conditions might be appropriate to ensure Mr. Primrose's appearance."). In truth, the nature and circumstances of the offense allegedly involved Mr. Primrose and his co-defendant conspiring to procure an identification card via false statements (Count One), the use of an identity not belonging to him (Count Two), and a false statement made to obtain a U.S. passport (Count Three). These are charges that warrant release in nearly all other circumstances—especially for someone with no prior criminal history—and there is nothing about the nature and circumstances of

the alleged commission of the offenses that warrant detention, including the amount of time that has passed since Mr. Primrose's alleged initial stealing of and changing identities.

Also not to be overlooked or outright dismissed, and contrary to the government's allegations about Mr. Primrose's supposed underlying motivation for his alleged commission of the offenses, is that a benign reason could very well explain the genesis of his offense. It could be the case that, for example, Mr. Primrose assumed a new identity to escape a bad situation while living in Texas, such as the collection of outstanding debts, familial disputes, or several other non-salacious reasons not involving international espionage. This factor, therefore, either weighs slightly in favor of his release, or at best to the government, is neutral.

2.    *Weight of the Evidence*

The second section 3142 (g) factor concerns the weight of the evidence, which this Court should not place considerable emphasis on because doing so is akin to applying a presumption of guilt, which is expressly forbidden under section 3142(j). And even if this Court considers the weight of the evidence supporting Mr. Primrose's supposed guilt, case precedent in the Ninth Circuit dictates that the weight of the evidence is the least significant factor under 18 U.S.C. § 3142(g). *See Motamedi*, 767 F.2d at 1408; *United States v. Townsend*, 897 F.2d 989, 994 (9th

21

Cir. 1990); *United States v. Jones*, 566 F. Supp. 2d 288, 292 (S.D.N.Y. 2008) ("Courts generally consider the Weight Factor as the 'least important' of the Factors."). The Magistrate Judge likewise agreed that "the weight of the evidence is clearly not the strongest factor [in this case]." *See* Exhibit A, at p. 10. Accordingly, this factor also weighs in favor of Mr. Primrose's release, irrespective of the government's belief that it is "significant." *Id.* at p. 10.

3.    *Mr. Primrose's History and Characteristics*

The third section 3142(g) factor concerns Mr. Primrose's history and characteristics. This factor strongly favors release. Aside from the allegations in the government's Motion and those it made at his detention hearing, Mr. Primrose has no prior criminal record. He is physically healthy and has no mental health issues. Though he does not have family ties in Hawaii other than his co-defendant, he has lived here for over twenty years and has been employed full time with the U.S. Coast Guard and then a defense contractor until his arrest. And while the extent of his finances is not fully known, it is believed that Mr. Primrose could immediately post a bond secured by cash deposited with this Court to help effectuate his release. He also has no history of drug or alcohol abuse, and absent a criminal record, he has never failed to appear at any court proceedings. He was also not on probation or parole at the time of his alleged commission of the offenses.

Finally, although the government has made allegations about Mr. Primrose's supposed connections to Russia and the KGB, they are purely theoretical. As argued above, the unsupported speculation about Mr. Primrose's background, as well as the genesis of his alleged identity theft, should not result in his detention.

### 4.    *The Nature and Seriousness of the Danger Posed by Release*

The fourth section 3142(g) factor, the nature and seriousness of the danger posed by the person's release, also counsels in favor of release. The government's arguments for detention are not based on danger to the community. The Magistrate Judge likewise predicated his Detention Order solely on Mr. Primrose's purported serious risk of flight, and not his danger to any one person or the community. *See* ECF No. 24, at p. 2. There are also *zero* statutory presumptions for detention that Mr. Primrose must rebut. Moreover, and as noted, Mr. Primrose has no prior criminal record, no substance or mental health issues, and no history of violence. All of this portends his lack of dangerousness to the community.

Finally, and as referenced *supra*, the government has not produced any credible supporting evidence to demonstrate Mr. Primrose is a danger to the community on the basis that he is a spy. It is equally plausible, and in fact, far more likely, that the genesis underlying his alleged crimes has an unremarkable backstory. Whether such a story will be told remains to be seen, but the government's allegations underlying the charges in this case are entirely without

23

merit and should not be given consideration by this Court to detain Mr. Primrose. At the very least, if the government wishes to rely on this speculation, it should put on actual evidence to support it.

###    C.    Defendants on Bond Are Not Likely to Flee or Recidivate

It is not necessary, furthermore, to detain Mr. Primrose to meet the primary goals of the Bail Reform Act, which are to reasonably assure appearance in court and community safety. In this case, guidance by the Administrative Office of the Courts (AO) statistics demonstrates that nearly everyone released pending trial in the federal system appears in court and does not reoffend. In fact, in 2019, almost 99% of released federal defendants nationwide appeared for court as required, and 98% did not commit new crimes on bond.[6] Interestingly, "pretrial detention is itself associated with increased likelihood of a prison sentence and with increased sentence length," even after controlling for criminal history, offense severity, and socio-economic variables.[7]

---

[6]    U.S. District Courts, *Pretrial Services Violations Summary Report for the 12-Month Period Ending December 31, 2019,* AO Table H-15 ("AO Table H-15"), archived at https://perma.cc/LYG4-AX4H. (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate of 1.9%).

[7]    James C. Oleson, et al., *The Sentencing Consequences of Federal Pretrial Supervision,* 63 Crime and Delinquency 313, 325 (2017), archived at https://perma.cc/QAW9-PYYV.

24

The bond statistics for this district, moreover, likewise strongly suggest that Mr. Primrose should be released. In 2019 in the District of Hawaii, not a single federal defendant on pretrial release was rearrested for any offense, and not a single defendant failed to appear as ordered.[8] This Court, therefore, should reverse the Magistrate Judge's Order Detaining Mr. Primrose and order that Mr. Primrose be released because the government has not established that he would be among the approximately 1% of defendants nationally who fail to appear in court, or the 2% nationally who are rearrested on bond. Detaining Mr. Primrose without such evidence violates his constitutionally protected liberty interest.

## IV.   CONCLUSION

For the reasons set forth above, as well as for any others this Court may deem fair and reasonable, this Court should revoke the Magistrate Court's Order Detaining Mr. Primrose and find that there are conditions or a combination of conditions to reasonably assure Mr. Primrose's appearance at future Court proceedings if released, and release Mr. Primrose pending further proceedings in this case on the conditions described above.

//

//

//

---

[8]     *See,* AO Table H-15.

25

DATED:   Honolulu, Hawaii, August 11, 2022.


        /s/ Max J. Mizono
MAX J. MIZONO
Attorney for Defendant
WALTER GLENN PRIMROSE